Case number 21-2417, Western Missouri, Joseph Mobley v. St. Luke's Health System. No, it doesn't matter. Mr. Tanner? Yes, sir. May it please the Court, Counsel. My name is Henry Tanner and I represent Joseph Mobley for his disability discrimination claims against St. Luke's Health System. The Western District of Missouri granted summary judgment in favor of St. Luke's and we appeal to this Court for a reversal of that order. Mr. Mobley is a 39-year-old man who was diagnosed with multiple sclerosis in 2016. At that time, he worked as a supervisor in the St. Luke's patient access department handling insurance matters. The MS started as a meniscus tear that did not heal properly, then developed into a limp, then came the walker, and now the wheelchair. This occurred over the course of two years. St. Luke's management observed most of Mr. Mobley's loss of his mobility, watching him struggle to navigate the office, holding on to walls. They never initiated a conversation to help him. When Mr. Mobley finally realized he needed to ask for help, they told him no. From there, they only hindered him. They never helped him. The issue before the Court today is whether there exists a genuine issue of material fact regarding Mr. Mobley's failure to accommodate claim and his disability discrimination claim. I will address this issue first by discussing the errors of the District Court. Can I ask you a question, sir? In your discussion of the failure to accommodate claim, you, in your briefing, rely entirely on authority either from other circuits or from the Missouri courts, which I understand is relevant certainly for the Missouri state law claims. Do you have any Eighth Circuit case that's similar to this case, where the Court has found that in a dialogue like the one that Mr. Mobley engaged in with his employers at St. Luke's, that that was a failure to accommodate? That's a great question, Your Honor. No, we do not have an Eighth Circuit case with similar circumstances to Mr. Mobley. We hope this would be the case. And so this is an issue of first impression with these circumstances. Well, I was going to ask, coming in the other way, how do you distinguish Evans and Lane? Yes, Your Honor. There's more than just no Eighth Circuit law in your favor, it seems to me you've got to distinguish. Well, those facts are inopposite. I believe the Lane case addressed a federal clerk, a judge's clerk, who needed to be in the office. Here, Mr. Mobley did not need to be in the office every day. In fact, he telecommuted. That's the issue. That is the issue, and that's the problem with this case. The problem is, he already telecommuted, everyone telecommuted. He did not need to be in the office to do his job. Now, wait, counsel, you just stated what I, contrary to what I thought was undisputed. First of all, everybody got one day off. Second of all, some of the people he supervised who were not performing well were required to work in the office, not remotely. Is that not undisputed? No, that is disputed. Most people got more than two days off each week. I'm talking about, there's a statement that there were non-performing employees among the 15 to 20 that Mr. Mobley supervised who were required because of their performance problems to be at the office regularly. Is that wrong or disputed? That's not wrong, but it's immaterial. It's immaterial because- It's contrary to what you said were the facts. Maybe I misunderstood the question. But it's immaterial because Mr. Mobley did not need to be in the office to do his job. The material prong is whether or not it's an essential function of Mr. Mobley's job to be in the office every day and supervise those individual employees who may or may not be there working. That's not the case. But he wasn't required to be there every day. Exactly. The question I was going to ask you is, what does the record show as to how many times Mr. Mobley worked at the office during a flare-up? During a flare-up, the record is silent on that occasion. It's my understanding- I'm resisting summary judgment on the accommodation issue. Judge, I believe that part of the burden was to show that Mr. Mobley worked at the office and at home, both during flare-ups and not, successfully, and so we showed that. When he had a flare-up, that wasn't a part of the record. I don't think Mr. Mobley was taking notes of when he had flare-ups and was at the office. The issue is- But the lawsuit is about, I want flare-ups, I want to stay home whenever I have a flare-up. Right. Meaning, self-defined by him. No. Well, no? No, not at all. That's wrong. The doctor, his doctor, his doctor actually testified during depositions and said, You know what? Mr. Mobley has a flare-up for one, or maybe two days, and it doesn't occur every week. Wait. But from the employer's perspective, it's, how unpredictable is this? Right. I didn't understand that the accommodation discussion that he had, to which he did not like the response. I didn't understand the discussion was, I will get a doctor's note every time I need to stay home because of a flare-up. I thought that may be inherent, and I have a misunderstanding. I assumed it was kind of inherent to MS that you don't necessarily know until you wake up one day that you're having a flare-up. Right. And so I assumed the employer would know that. And so the employer knew this was going to be open-ended and left to the discretion of Mr. Mobley when he got up every morning, whether he was coming in. And therefore, that was the accommodation requested. Well, I think you're correct in your analysis, but you're incorrect in what actually occurred during that meeting. During that meeting. I haven't read the depositions about that. Well, and that's the point. Sure. During that meeting, there was no interactive process, and if there was, it certainly wasn't done in good faith. Because they never asked him about an MS flare-up. Wait. Use paid time off, and we'll keep talking about it. Those aren't accommodations under the law or under the circumstances. What case says a PTO cannot be an accommodation? I understand the argument, but I don't believe that's been certainly not held by this court. The case, well, it should in no disrespect, but an accommodation has to address the individual's limitations. And so if the accommodation is not effective at addressing this individual's limitations, then it's not an accommodation at all. It's just a modification. It has to address something. Can I ask a question about that, sir? The requested modification here was that he be able to telecommute sort of at his own discretion, although I'm not doubting that he would correctly identify when he had a flare-up, to telecommute in addition to the sort of traditional one or two days of telecommuting when he was having a flare-up. It is my understanding from the record that that accommodation was not granted. What record do we have about whether he either had to take PTO during flare-ups or whether when he did call and say, I'd like to work from home today, he was denied? I'm looking for something in the pragmatic world about the effect of them saying, I'm not granting this accommodation, but it feels from the record kind of like they did. I mean, he was allowed to work at home. We don't have any evidence of a time that he asked to work at home that was denied. What's the record like there? The record is his FMLA PTO use. And I would need to find that specifically, but he took a number of FMLA days and PTO. And there weren't many days in which, you're right, Judge Menendez, there weren't many days in which he said, I'm having a flare-up, I have to take PTO. Usually it was, he could just work from home. But that's the key issue. But they didn't agree as an accommodation, but functionally they let him do it. Sometimes. But the purpose, and what Judge Loken said, the effect was, you need to take time off. His doctors said, don't take time off. You need to work if you have MS. You should work if you're willing to work. And so that proposed accommodation isn't an accommodation at all because it contradicts medical advice. It contradicts the individual's limitation. And it harms him. He has to lose money. Everybody else can take off, excuse me, everybody else can telecommute for medical reasons, including him. But for his disability, which they are ostracizing. If the doctor says you need to work, and that may well be very sound, the doctor doesn't control it. You have to be allowed to work at this job. That's not within the doctor's purview. You're exactly right, Judge Loken. I'll make two points. Jessica Lillard, the decision maker, certainly isn't the doctor. St. Luke's and the lawyers for St. Luke's certainly aren't the doctors to say, hey, if you're feeling like you're a little tired, why don't you just stay home? They're doing that in their own opinion. They're not doing that for business reasons. And here's why he could have performed this job and telecommuted. He did it, telecommuted while his condition flared. He did it for 15 months while he was disabled. He can't walk at work. He's still working. He's still telecommuting. He's still handling all of the business that he needs to handle. Okay, so this comes down to the assertion that PTO and FMLA leave are not lawful accommodations. They're not lawful accommodations. He got that. He kept working. It worked out until he said, I'm tired of this. I'm going somewhere else. I want to request an accommodation. That's when they said no. Well, he defined that the accommodation has to be my way. No, he didn't. No, he didn't. He just asked for a flare-up. And you know what they did? They didn't say what their concerns were with his request. They never communicated that. It's an interactive process. They have to communicate with him. They never communicated. They never said, hey, we've got a problem with your flare-ups. They didn't say any of that. I thought after the meeting at which they say it ended, not at this time. Yeah. Your position is it was a no. Yeah. But the record, I thought, was that he never revisited the issue with them. That's not the record. And I have that citation right here. Let me address what the court missed in his record. Excuse me. The district court correctly points out the legal standard that it must be that the evidence must be in light of the favorable non-moving party. But he doesn't follow that standard. Absent, the court omits the first request that plaintiff asked Lillard for assistance because he was struggling at work. The court simply says he asked to telecommute. There's not even a hint that he's asking to telecommute for his disability. This is material because it should have triggered St. Luke's duty to engage in an interactive process. This is Mobley Appendix 423, Paragraph 3. It's in the summary judgment opposition. Now I'm talking about December 2017. I'm getting there. Then the court overlooks, that was December 2017. Then the court overlooks, this is the same time, that St. Luke's rejects Mobley's request to telecommute for his disability and the decision maker gives a reason different from which that the court makes his ruling. That's not even in the judge's order. He doesn't even consider Mobley's version of events or what happens. Specifically, Lillard told Mobley that he could not telecommute as an accommodation because it would be unfair to his coworker and ask for medical documentation. Mobley Appendix 438. Then the court agrees with St. Luke's that Mobley never followed up to ask for an accommodation a third time. They agree with St. Luke's. However, Mobley submitted to the court that he pleaded with Lillard that she reconsider her decision and the answer was simply no. Mobley's evidence is nowhere in the order. And that's cited at Mobley Appendix 441 and 425. I'm sorry, 441 and 425 are the places where he asks Lillard for reconsideration. Opposition. Yes, Your Honor. None of Mobley's version of events didn't appear in the judge's order. He just adopted St. Luke's argument. That was it. I'd like to save some time for rebuttal if I can. I think I have ten seconds. Thank you. Thank you. Ms. Schorgel. May it please the court. My name is Jennifer Schorgel and I represent the defendant appellee, St. Luke's Health System. And I'm here to defend the district court's grant of summary judgment in favor of St. Luke's on all of Mr. Mobley's claims and ask that this court affirm that decision. I wanted to start first with addressing a couple points that Mr. Tanner raised in his opening argument by pointing out that the briefing in this case has been plagued with statements that are not supported by the record and that has happened again today. For example, in his opening argument, as he did in his briefing, Mr. Tanner goes beyond what the record was before the district court and stated that when Mr. Mobley asked to work from home when his condition flared, he was just simply told no and that was the end of the story. And that is not what the evidence in the record shows. He was told that he could not at this time work from home when his condition flared because of the open-ended and indeterminate nature of that request rendered it unreasonable in addition to the supervisory component of his job that also required it, that also rendered it unreasonable. And as Mr. Tanner admitted in his opening statement, the weakest performers on Mr. Mobley's team worked in the office and those were the employees that needed the most support and training and supervision from the Let me stop you. What's the record as to how many of those there were and why he needed to be there physically? Sure. So the record is that there were about 15 to 20 direct reports on Mr. Mobley's team and the majority of them did work from home. But what the record and the evidence says and what is undisputed is that the weakest performers were in the office. Okay. Are they quantified? Are they named? And are there reasons given? And where do I find that? No, Your Honor. There's nothing in the record. It's just your client said, well, he was supervising some people who we made come to the office. What more is there in the record than that? The evidence in the record is that, well, one, Mr. Mobley admits that the job responsibilities as a supervisor required his managing and training his team. And Mr. Mobley did not controvert before the district court that the weakest performers Counsel, the devil's in the details. You want to keep giving me generalities and I'm asking you for the details. Who were they? How many were there? Why did he need to be there? Who testified to that? What documentary evidence supports it? Sure. So there's, to answer your question, Your Honor, there is not in the record a specific number of which of those employees were the weakest performers or by name who those people were. But Mr. Knutson, who was the director of Mr. Mobley's Department of Patient Access, who's two layers above him, testified that the weakest performers need the most support in the office. And why do we believe him and not claim it at summary judgment? Well, it's a fact that Mr. Mobley didn't dispute and didn't controvert. He disputed, well, counsel disputed. They said he was working successfully at home. He wasn't needed at the office. Implicitly, the people he was supervising, whether they were in the office or not, he was continuing to successfully supervise. That's the import of his testimony, as I understand it. And now you say, well, we've got to go to the HR guy who says to the contrary or whoever you were citing. Sure. So the record at... We don't do that at summary judgment. Right. The record at the district court level and the undisputed facts before the district court are that the weakest performers worked in the office. And Mr. Mobley did not dispute that fact before the district court. Does the record also show that during the 15 months that he was functionally having this accommodation, he was effectively supervising those weakest performers who were in the office? That was one of the periods of time that he received a 4 out of 5 on his review, right? Correct. He did receive positive performance reviews. And he was allowed to work from home one day per week as a supervisor. But during the 15 months that opposing counsel described, where he functionally received this accommodation of working at home during flare-ups, did he also receive that 4 out of 5 evaluation for supervising the people, despite their presence at the office? So during the first quarter and the second quarter of 2018, Mr. Mobley did receive a 4 out of 5 on his performance review. I don't think that the record has anything about whether the performance review commented in terms of how effectively he supervised his staff during that period of time. But he did receive a positive performance review during... Oh, I'm sorry. I interrupted you. Go ahead. It's okay. During that time. I was going to ask for another record clarification. Can you help me understand how many times... So it's my understanding that your position of the accommodation denial is not that no flexibility was offered, but that there was a denial as to the open-ended, whenever you have a flare-up, you can work at home issue. And it's my understanding from your briefing that it's your position that sometimes he was still allowed to work at home, work, not take PTO at home during a flare-up. Is that right? That's correct. So in response to his request to work from home whenever his condition flared, the evidence in the record shows that he was told he could not do that at this time because that was unreasonable for the reasons I've discussed earlier about the supervisory component and it being open-ended. But instead, what he was told was that you can continue to work from home on your one day per week as scheduled. And if the need arises for you to work from home beyond that, then you need to communicate with and engage in a dialogue with your manager so that she can determine on a case-by-case basis whether it was reasonable for Mr. Mobley to work from home on that particular day. And if it wasn't reasonable for him to work from home on that particular day, then he was encouraged to use paid time off. And what does the record show about how that actually worked? How often or if? Sure. So the record shows that, just to clarify, on the PTO portion? Either. How often was he calling and asking for that extra couple of days and having them granted versus being? What does the record show about how that worked? The record shows that he continued to ask Ms. Lillard whether he could work from home beyond that as the need arose. And she would say yes, except for one day. And between March of 2018, when the accommodation meeting took place, and August 2018, when Mr. Mobley resigned for another job, the record shows that he took 13 days of paid time off. And what Mr. Mobley testified, what is in the record, is when he was asked, is it fair to say that there were days in those six months that you needed to take leave because you could not work at all, whether from home, if that would have been reasonable, or either in the office, and his response was, there were days when, yes sir, I felt bad enough that I should not, I shouldn't have worked at home or in the office. So the record is that one day he asked for flexibility working from home and it was denied. Do we know how many days he asked for flexibility working from home that were granted between the meeting in March and the August resignation? So what the record shows is that other than that one day, she approved it. Other, for a number, how many times? You said other than that one day, she approved it. The record doesn't have a specific days of how many days specifically between the March and the August 2018 time frame when he asked to work from home more than his one day, but what the record does show is that he continued to work from home on his one day and then when he asked to work more than that one day, Ms. Lillard said yes, except for that one time. And I wanted to point out on this point about the failure to accommodate a couple more points. One is that, as pointed out when Mr. Tatum was up here, is Mr. Mobley, he wanted it his way. And he wanted to suggest that the employer should provide the exact accommodation that he requested, even if it wasn't a reasonable one. Let me stop because I'm still back on the details. And I was looking at the district court's opinion again to see what precisely was the basis for summary judgment on the accommodation. And it was that he did not establish the ability to perform the essential functions of his job. That was the basis. All this other stuff is whether there were disputed facts elsewhere or not is not, it seems to me, of particular significance to this court on appeal. But the essential functions is. So my follow-up question to what's the evidence about these other employees, which you've said none, in my view, almost none, other than an opinion. So what other evidence is there in the record of Mr. Mobley's inability to perform the essential functions of his job as he was successfully performing them? Other than the opinion of his supervisors that we want him in the office. So the evidence in the record is the undisputed testimony from Mr. Knudson, which is the director of the department, who said that the weakest performers. And that is in the fact that Mr. Mobley disputed at the summary judgment. He what? Did not just controvert at the district court. But it doesn't establish anything if there aren't any details. I mean, what is the evidence for Mr. Knudson that he couldn't successfully supervise these people remotely because they were in the office, other than a manager wants him there. She wants him there. Because he was as a supervisor. He was a patient access supervisor. But they're handling insurance matters. I know that. That's paperwork. I don't know why you can't supervise somebody doing paperwork from home. It's been happening for the last two years all over the country. That's true. At the time this decision was made, it was 2018. It was before. No, it wasn't. No, but seriously, I don't understand why, you know, 1 plus 1 equals 4 here. They wanted him at the office. There were people he was supervising that were required to be at the office because of their performance problems. And then they simply assert that means since he was a supervisor, he had to be there too. I don't think that's, I don't think you'd get a, I don't think you'd get a summary judgment on this element of a commendation prima facie case. That's why I asked you, what else is there about inability to perform essential functions? The main essential function that he was unable to perform by working from home is the supervisory component of his job, which is what the district court also. Okay, and who do I read about how the, why the purpose, why it was essential to supervise? I mean, it's essential functions. It's not functions. This is a serious component of an accommodation. I mean, it's how, it's actually, you know, it's like the prima facie case under Title VII. It's not supposed to be a huge hurdle. And so we're supposed to take the opinion of a supervisor that, well, since he's supervising and they have to be there so that he's not, he's not performing an essential function if he's not there. Well, I'm sorry, but I need something. I need an answer to why. So St. Luke's decided that it's more effective to have supervisors in person and to be in the office with those, even if it's just a handful. Okay, and what case supports that that's enough to demonstrate inability to perform essential functions?  It's a case from the Western District of Missouri. But in that case, the court, the employee had flare-ups and the court granted summary judgment on the failure to accommodate claim noting that that plaintiff's job duties involved a supervisory component that benefited from personal interaction. And so a work-from-home option would not have been a reasonable accommodation for that position given the supervisory component. One of my questions about this essential functions issue is that they clearly believed he could perform this essential function remotely because he did so with some regularity. In the Hanlon case, did the person also work remotely with some regularity? Did some of Hanlon's team, the majority of Hanlon's team work remotely? I don't have that fact right before me to be able to answer that. Because that's sort of a, one of the things Judge Loken I think is getting at is it's one thing to make this sort of conclusory statement, his worst performers were at the office. But the reality of his job, at which he received 4 out of 5 stars, was that he supervised those poor performers remotely all the time, or frequently. So we have a delta here of showing that the additional unquantified days that he might need to work remotely during a flare-up would make him unable to do that essential supervising when he was able to do it with some remote work. Where in the record can I draw additional support for that? Well, the other piece of it that I do want to touch on before I run out of time is that the other reason that his request was unreasonable is because it was open-ended and it was indefinite. And the evidence in the record showed that he testified he didn't know when a flare-up was going to occur, he didn't know the duration or the frequency. And Ms. Callow also testified that when she asked him during the meeting... Was that the basis for summary judgment on the accommodation case? The basis for summary... The argument, I know, it's most of the briefs, but that's why I went to the district court's opinion. Why? There are 3 or 4 elements to a prima facie case. First of all, was it thrown out for failure to make a prima facie case? And if not, why was it thrown out? And here it is, he failed to establish he could perform the essential functions of the job. Was there an alternative ground that we need to review? The alternative was that to the extent that Mr. Mobley could perform the essential functions of his job with the reasonable accommodation that St. Luke's did provide to him, continuing to work from home one day per week and as needed on a case-by-case basis, which his supervisor allowed him to do. And then if it wasn't reasonable on that particular day to use his paid time off, the record does not... The district court found that the record does not demonstrate that St. Luke's failed to engage in the interactive process in good faith. I know I'm out of time, so I want to be cognizant of that. Thank you. Thank you. Thank you. Mr. Butler, I'll give you a minute. Want to make a minute? Thank you, Your Honor. Better than 13 seconds. I appreciate it. Three quick points. The main issue here that's underlying all of this is St. Luke's engaged Mr. Mobley in bad faith. They didn't communicate with him. They didn't communicate their concerns. And the HR director admitted that. She said, well, if Jessica Lillard, the decision maker, had concerns about his condition, she should have sought clarifying information from his physician. That's nowhere in the judge's order. He didn't consider that fact. Second, Ashley Callow, included in the meeting to discuss the reasonable accommodation, testified that a trial run of the accommodation would have been helpful in addressing their concerns instead of just flat out rejecting it. Third, about moving these chairs. He was disabled. He couldn't walk. St. Luke's own physician said it was unfair for his manager to make him move chairs. You're going beyond. That's not rebuttal. You didn't argue that in your main argument. I'm sorry, Your Honor. I didn't get to that disability discrimination claim. We were all on the accommodation. I apologize. You can't do it in rebuttal. I'm sorry. Good to know. You know why that's the principle. I get it now. I didn't know it as I was doing it, but I do understand, Judge. Thank you. Very good. Case has been thoroughly briefed and the argument's been helpful and we'll take it under advisement.